Manasra confirmed that the ring was, "Navajo…yeah." Again, I recognized this ring as being identical to one documented during the July 30, 2012 inspection.



Manasra told me that he comes every weekend to the flea market and has been selling at the flea market and in Santa Fe for twenty-two (22) years. Manasra then picked out a Kokopelli (Hopi Deity) design pendant and earring set and gave them to me. I examined the pendant and observed a decal affixed to one side that read, "Made in Philippines." Without confronting Manasra about the decal, I asked if the piece was also Zuni to which Manasra replied, "Yeah." I also observed the same leaf symbol stamped on the inside of the pendant as those observed on the Sterling imports. Manasra sold the items to me in violation of 18 U.S.C. § 1159. I observed several other items offered for sale by Manasra that were consistent with Sterling Imports before he left the booth.

### Connection Between Manasra and A.N. Jewelry's Registered Business Address (the Nimer Property)

On July 2, 2015, RAC Ariel Vazquez conducted surveillance on the Cagua residence, in support of this investigation. During this surveillance the agent observed a newer model, white cargo van, parked in the driveway of the residence, (hereinafter, "New Market Van"). The agent noted and recorded that this van bore New Mexico license plate NHR850. Subsequent registration queries revealed that the New Market Van is also registered to Manasra.

On July 4, 2015, I observed Manasra and the New Market Van, parked at the Albuquerque Flea Market, in a different booth location. SA Wagner and I both observed that Manasra had the same type of jewelry displayed for sale in an identical manner as he did during the October 19, 2014 encounter. SA Wagner also noted large cardboard boxes inside the van, consistent with those observed during the October 19, 2014 encounter.

On August 17, 2015, SA Wagner observed Manasra and the New Market Van parked, again, at the Albuquerque Flea Market in the same location as observed on July 4, 2015. Manasra was in the process of setting up his booth in the same manner as previously observed. SA Wagner noted that the New Market Van now had a white, "C-O-E-X-I-S-T" sticker in the rear (passenger-side) window. SA Wagner also observed large cardboard boxes, consistent with the October 19, 2014 encounter, within the van.

On August 23, 2015, I conducted surveillance at the Nimer residence. At 7:44am, I observed Manasra arrive at the location in a black Mercedes SUV which bore New Mexico license plate MWH283. Subsequent registration queries revealed that this vehicle is registered to Abdel J. Manasra at 7401 Countrywood Ave. NW in Albuquerque, NM. Based on statements made by Manasra during the October 19, 2014 encounter and financial and property connections, Abdel Manasra is believed to be the brother of Mohammad Manasra. I

observed the male subject exit the Mercedes SUV and enter Nimer's property. The subject then backed the New Market Van down the driveway and subsequently retrieved a cardboard box from the Mercedes SUV. The male subject placed the box in the passenger seat of the New Market Van, entered the vehicle, and exited the driveway. I observed the subject drive the New Market Van to the Albuquerque Flea Market located at Central Ave. and Louisiana Blvd. Later that same day, at approximately 4:30pm, I observed the New Market Van parked on the Nimer property. Specifically, the New Market Van was parked at the end of the driveway and behind a chain link fence which closes in the side yard of the property. I noted that the Mercedes SUV was no longer at the Nimer property.

Again, on August 29, 2015, at 7:20am, I observed the Mercedes SUV parked at an intersection close to Nimer's residence. Additionally, I observed that the New Market Van was absent from Nimer's property. At 3:00pm that same day, I observed the New Market Van parked behind the fence at Nimer's residence and that the Mercedes SUV was gone.

And again, on August 30, 2015, at 6:10am, I observed the New Market Van parked at the Nimer property. At 8:14am, I observed one male subject fitting Manasra's description, arrive at Nimer's residence. The subject was driving a white Dodge Grand Caravan bearing NM license plate MLA224. Subsequent registration queries revealed that this vehicle is registered to Abdel J. Manasra at 7401 Countrywood Ave. NW in Albuquerque, NM. I observed the subject retrieve a cardboard box from the Grand Caravan and place the box in the passenger seat of the New Market Van. I then observed the subject leave the property driving the New Market Van. At 1:00pm, I observed Manasra and one additional male subject at Manasra's booth at the Albuquerque Flea Market. I observed the same Native American-style jewelry in glass cases, setup at Manasra's booth. I observed the New Market Van parked behind Manasra's booth and a cardboard box, placed in the passenger seat of the New Market Van. This box was consistent with the box I had seen placed in the New Market Van at Nimer's residence, previously. At approximately 3:00pm, I observed Manasra outside his residence at 909 Tumulus Dr. NW in Albuquerque, NM. I also observed the Grand Caravan parked in the street outside the residence. I observed Manasra talking on a mobile phone as he appeared to be shuffling vehicles in his driveway.

On September 6, 2015, I conducted surveillance at Nimer's residence. At 2:27pm, I observed one male subject, fitting Manasra's description, arrive at the residence driving the New Market Van. I observed the subject retrieve a cardboard box from the New Market Van and place the box in the back of the Grand Caravan. I then observed the subject parking the New Market Van behind a fence of the residence.

On September 12, 2015, at 11:43am, I observed the Grand Caravan parked in the front parking lot of Sterling. I then observed a male subject fitting Manasra's description drive the Grand Caravan from Sterling to Nimer's residence. While following the Grand Caravan, I lost visual contact for approximately two minutes. I

regained visual contact of the van, but the driver had already parked in the driveway of Nimer's residence directly behind the New Market Van and could no longer be seen outside the residence. The Grand Caravan could not have been parked there for more than 30 seconds before I took up surveillance of Nimer's residence. I maintained the surveillance for approximately one hour but saw no further movement. Based on my investigation and experience, there is probable cause to believe the driver of the Grand Caravan was inside the Nimer residence or in the fenced area behind the Nimer residence.

On September 13, 2015, at 6:43am, I observed the Grand Caravan parked back at Manasra's residence at 909 Tumulus Dr. NW in Albuquerque, NM. The Grand Caravan was backed into the driveway close to the garage door. Then at approximately 7:30am, I conducted a trash cover at Sterling in an attempt to recover any evidence of the Grand Caravan's visit the previous day. I recovered several large, clear plastic bags, each filled with the empty jewelry packaging, which was all consistent with that used in the shipments from FA4U.

On Saturday, October 24, 2015, SA Wagner conducted a surveillance of Manasra's residence at 909 Tumulus Dr. NW in Albuquerque, NM. Simultaneously, I conducted a surveillance of the Nimer residence at 2304 Cagua NE in Albuquerque, NM. Both of us initiated our surveillances at approximately 6 am. SA Wagner initially observed the Grand Caravan and a silver SUV parked side-by-side in the driveway of the residence. These two vehicles blocked the garage from vehicle entry and exit. At approximately 7:20am, SA Wagner left his position at the Manasra residence and returned at approximately 7:32am. Upon his return, SA Wagner observed that the Grand Caravan had been moved onto the street in front of the residence and the spot that it had been parked in the driveway was vacant.

At approximately 6am, I observed the New Market Van parked behind the fence on the Nimer residence property. Additionally, I observed a white sedan parked in the driveway behind the New Market Van. At approximately 7:36am, I observed Manasra arrive at the Cagua residence driving the black Mercedes SUV. I observed Manasra park the vehicle across the street from the residence and enter the premises. I then observed an unknown male subject move the white sedan from the Cagua residence driveway to clear the way for the New Market Van. I then observed Manasra back the New Market Van down the driveway of the residence, walk across the street and retrieve some items from the front passenger seat of the black Mercedes SUV. I then observed Manasra open the rear lift gate of the black Mercedes SUV. Subsequently, I observed Manasra walking away from the black Mercedes SUV with a white colored package and the items he retrieved from the passenger seat. Manasra then opened the passenger side door of the New Market Van and placed the items into the van.   This behavior was consistent with previous surveillance operations in which Manasra was observed retrieving items from the rear cargo area of his vehicle and placing them into the New Market Van. Manasra then entered the driver's side of the New Market Van, exited the driveway and drove in the direction of the Albuquerque Flea Market.

On Sunday, October 25, 2015, SA Wagner conducted a surveillance of Manasra's residence at 909 Tumulus Dr. NW in Albuquerque, NM.  Simultaneously, I conducted a surveillance of the Nimer residence at 2304 Cagua NE in Albuquerque, NM.  SA Wagner observed the Grand Caravan and a silver SUV parked side-by-side in the driveway of the residence.  These two vehicles blocked the garage from vehicle entry and exit.  At approximately 7:40am, SA Wagner observed Manasra move the Grand Caravan from the driveway and onto the street.  SA Wagner then observed Manasra exit the garage of the residence driving the black Mercedes SUV and leave the area.

At approximately 7:30am, I observed the new market van parked on the Nimer property and a white sedan parked in the driveway directly behind the new market van.  At approximately 7:55am, I observed Manasra arrive at the Nimer residence in the black Mercedes SUV and park in front of the residence on the street.  I observed an unknown male subject move the white sedan out of the driveway clearing the way for the new market van.  At 8:08am, I observed Manasra backing the new market van down the Nimer residence driveway.  I then observed Manasra exit the new market van and walk to the black Mercedes SUV where he unlocked the rear lift gate.  I then observed Manasra remove two cardboard boxes from the cargo area of the black Mercedes SUV and place them on the front passenger seat of the new market van.  The boxes were consistent with those observed on previous surveillances of Manasra at the Nimer residence and at the Albuquerque flea market.  Manasra retrieved an additional item from the front passenger area of the black Mercedes SUV, placed it in the new market van and drove away at 8:11 am.

At approximately 8:30am, I observed Manasra at the Albuquerque flea market setting up his jewelry booth.  I observed the new market van parked at the location and the two cardboard boxes in the front passenger seat.  I also observed Manasra organizing Native American-style jewelry on the tables set up in his booth.

***Conclusion***

Based on the facts related within this affidavit, my training and experience, and the training and experience of agents and investigators involved in this investigation, there is probable cause to believe that the items to be seized as described in Attachment B, which is attached hereto and fully incorporated herein, will be located at the premises described in Attachment A, and are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 542 (importation by false or fraudulent practice), 19 U.S.C. § 1304 (failure to mark goods with country of origin), 18 U.S.C. § 1159 (violation of the Indian Arts and Crafts Act), and 18 U.S.C. § 371 (conspiracy).

7.  **Business Name:**          Sundancer Jewelry, d.b.a., GS New Mexico

    **Owner Names:**          Mohammad Sharifi, Steve Sharifi, Soraya Sharifi

    **Search Location:**          202 San Felipe NW, Ste. A, Albuquerque, NM

    **Organizational Role:**          Retailer

Sundancer Jewelry ("Sundancer") is a retail location located at 202 San Felipe NW, Ste. A, in the Old Town portion of Albuquerque, NM. Mohammad R. Sharifi is listed as the President, Zahir Sharifi is listed as the Vice President and Secretary, and Steve Sharifi is listed as the Finance Administrator.

*Financial Links to Sterling*

    An examination of financial records revealed approximately $70,255 in payments from Abdul Sharifi and Soraya Sharifi, d.b.a., Sundancer / G S New Mexico Silver, to Sterling. The payments were made by checks drawn on Sundancer and G S New Mexico Silver accounts with Bank of America (Acct. # 439004433752 and 000119600617, respectively). The payments were made to Sterling's Bank of America account, numbered 435017473826.

| Date | Check Signer / Notes | Amount | Payee |
|------|----------------------|--------|-------|
| 10/2/2012 | Soraya Sharifi (…3752) / Silver Jewelry | $7,000 | Sterling (435017473826) |
| 10/3/2012 | Soraya Sharifi (…3752) / Inv. #1447 | $5,048 | Sterling (435017473826) |
| 1/19/2013 | Abdul Sharifi (…3752) | $17,656 | Sterling (435017473826) |
| 5/19/2013 | Abdul Sharifi (…0617) / Silver Jewelry | $4,506 | Sterling (435017473826) |
| 9/17/2013 | Abdul Sharifi (…0617) / Silver Jewelry | $6,222 | Sterling (435017473826) |
| 3/22/2014 | Abdul Sharifi (…0617) / Silver Jewelry | $10,737 | Sterling (435017473826) |
|  |  | $51,169 |  |

On January 28, 2014, records were obtained which included a partial Sterling receipt titled, "Sold to: Sundancer Jewelry (GSNM)." The partial receipt detailed two hundred and thirteen (213) pieces of jewelry with a total amount of $9264.

*Covert Purchases*

    On October 17, 2014, I visited Sundancer in a covert manner and observed various pieces of jewelry offered for sale, which were consistent with jewelry imported by Sterling from the Philippines. None of these items were marked in any way to inform the customer that they were manufactured in the Philippines. Soraya Sharifi was working in the store at the time and helped me during the contact. I asked to look at some bracelets which I recognized as being consistent with Sterling imports.



Sundancer Purchase

Sterling Import

Specifically, I recognized the inlaid pueblo design, the unique symbols and the "CR" initials stamped on the on the inside of the bracelet.

I also recognized several rings to be consistent with those imported by Sterling. Specifically, I recognized the "cornrow" inlaid design and the initials "CK" stamped on the inside of the rings.

Sterling Import



Sundancer Purchase

Soraya told me that the rings were Zuni made. She went on to explain that, in general, the inlaid jewelry was Zuni-made and the single stone jewelry was Navajo-made. I then asked to look at a necklace and earring set which I recognized as being consistent with a Sterling import. Specifically, I recognized the pendant design and "NT" initials on the back of the item.

41



Sundancer Purchase

Sterling Import

Soraya told me that the necklace and earrings were Navajo-made. I motioned to the necklace and confirmed that it was Navajo, to which she agreed. I then asked if both the bracelet and ring were Zuni-made and Sharifi confirmed that they were. Soraya went on to say that she has had the store for three years but her family has been in the jewelry business for twenty years. Soraya then explained that she has, "some Navajos in the back that …hand make pieces." The items were sold to me for a total of $1001.52, all in violation of 18 U.S.C. § 1159.

*Recent Activity*

On October 16, 2015, an assisting federal agent visited Sundancer in a covert manner. The agent observed jewelry displayed in the store and offered for sale which was consistent with Sterling imports. Steve Sharifi, husband of Soraya, told the agent that some of the jewelry was Native American to include Navajo, Zuni, and Hopi, some of the jewelry was made in-house, and some was traded with locals and those pieces could be made elsewhere. I reviewed the covert video of the visit and observed several items offered for sale in the store which were consistent with Sterling imports. Depicted below are two of the pieces I observed in the video which are consistent with Sterling imports. Additionally, the necklace seen in Sundancer appears to be consistent with the necklace I purchased on October 17, 2014.



Importation Photographs



Sundancer Items

## *Conclusion*

Based on the facts related within this affidavit, my training and experience, and the training and experience of agents and investigators involved in this investigation, there is probable cause to believe that the items to be seized as described in Attachment B, which is attached hereto and fully incorporated herein, will be located at the premises described in Attachment A, and are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 542 (importation by false or fraudulent practice), 19 U.S.C. § 1304 (failure to mark goods with country of origin), 18 U.S.C. § 1159 (violation of the Indian Arts and Crafts Act), and 18 U.S.C. § 371 (conspiracy).

43

8. **Business Name:**          Silver Coyote

   **Owner Name:**           Yousef Nassar

   **Search Location:**       112 Old Santa Fe Trail, Santa Fe, NM 87501

   **Organizational Role:**   Retail

Yousef Nassar is listed as the registered agent of Silver Coyote according to New Mexico Secretary of State records. Tamara Nassar, Yousef Nassar's wife, is listed as the registered agent of a sister store, Santa Fe Native Designs.

*Financial Links to Sterling*

A review of bank records revealed that a financial relationship exists between the Nassar's and Sterling. Over $21,000 in checks (many referencing silver jewelry in the memo line) have been written by Yousef Nassar and Tamara Nassar (Yousef's wife) from the business accounts of Silver Coyote and Santa Fe Native Design to Sterling.

*Covert Purchases*

On August 16, 2012, HSI SA Mark Phillips and I visited Silver Coyote, located at 112 Old Santa Fe Trail in Santa Fe, NM in a covert manner. Silver Coyote is a jewelry store which is located in the "plaza" district of Santa Fe, NM. When I entered the store a salesman, Justin, told me that everything in the store was 60% off in preparation for "Indian Market."

Justin told me that everything in the store was Native American made. While in the store, I overheard another employee tell 'Tiger,' the owner of the store (who I later identified as Yousef Nassar), that a "928" stamp on one of the jewelry pieces in a case meant the piece was not made in the United States. The employee said that three customers had told him about the stamp. At that point Nassar got very angry and told the employee to shut-up. Nassar said he was the boss and if an employee wants to know something he should ask him. Nassar said, "if there is a snake in the store I'll cut his head off." Nassar went on to say that he had six kids and a wife to take care of. All of this was said in front of SA Phillips and me, as we walked around the store. After the exchange between Nassar and the employee, Nassar told me that some of the items in the store were imported. None of the pieces appeared to be marked as imported or stamped with the country of origin.

I observed several pieces of jewelry in the store that were similar in appearance to pieces imported by Sterling. Nassar gave me one of his cards when I expressed interest in buying some jewelry.[3]

---

3 On several occasions, I have observed Yousef Nassar at the Santa Fe Native Designs store.

On September 28, 2012, SA Phillips and I once again made a covert contact with Nassar at Silver Coyote in Santa Fe, NM. I questioned Nassar about two bracelets which were consistent in appearance with those that I had seen imported by Sterling, on May 28, 2012 under UPS H8967696291. Specifically, I recognized the inside of the bracelets have a series of distinct stamped or engraved symbols as well as the



Inspection Photograph

initials "CR" marked in them. Additionally, it is apparent from the interior markings on the two bracelets that they have been stamped using the same "mold" as the same defects appear in both bracelets in the same sequence. When asked by whom and where the bracelets were made, Nassar told the SAs that they were made in Albuquerque and Gallup at his factory and were Indian designed. Nassar told me that the



Purchased Item

items were made in America on three separate occasions. I purchased the two bracelets from Nassar for a total of $932.59. Upon purchasing the items, I compared them to the photographs of those imported by Sterling and found them to match.

On July 16, 2013, I entered Silver Coyote in a covert manner and observed various cases of Native American style jewelry and other Native American style crafts for sale in the store. The owner of the store introduced himself to me as "Tiger," and recognized me from their previous encounters. Nassar's son was also present in the store. I observed several pieces of jewelry which were consistent with that which had been



Purchased Item

imported by Sterling from FA4U. I referenced a visit to the store that I made approximately a week prior in which I had not seen Nassar. Nassar told me that his cousin was working in the store at the time.

I asked about a ring which I had been told was produced by "GL Miller," by Nassar's cousin during the visit a week prior. Nassar found the ring and showed it to me. I asked Nassar why one of the rings appeared to have a hole in one of the inset pieces of spiny oyster shell. (The hole appears to be drilled into the shell.

I speculated at the time that another, filler stone, had fallen out
of the ring.) Nassar told me that the hole was supposed to be
there as that is how the glue is injected under the shell pieces to
adhere them the ring bezel. Nassar's son told me that he would
receive a certificate of authenticity with the ring if I purchased it.
(After the son told me about the certificate, Nassar said
something to his son in Arabic. Upon review, it was found that
Nassar's statement is unintelligible.) I recognized the spiny
oyster ring as being consistent with a Sterling imported item.
Specifically, I recognized the design and raincloud symbol on
the inside of the ring. I had seen this type of ring and the



raincloud symbol in photographs taken during the inspection of a Sterling import on July 30, 2012. Nassar told
me that he would not charge me sales tax for the purchase. Nassar then told me that the ring was Hopi made,
but not made by GL Miller. I observed several rings offered for sale in the store which were of the same design
and appeared to be consistent with Sterling imported items.

Nassar told me that the Hopi artist that made the ring is 87 years old. Nassar also told me that only
Silver Coyote and another store in Taos carry the artist's work. I asked for the artist's name while referencing
the raincloud symbol on the inside of the ring. Nassar told me that the artist's name was "Koko Bilah," wrote
the name on his business card for me, "Koko Bilah," and gave the business card to me after the purchase was
complete. Nassar sold the "Koko Bilah" ring to me for $195, in violation of 18 U.S.C. § 1159.

### Recent Activity

On October 14, 2015, an assisting federal agent entered the business in a covert manner. The agent
observed several pieces of jewelry in the store which were consistent with Sterling imports.

### Conclusion

Based on the facts related within this affidavit, my training and experience, and the training and
experience of agents and investigators involved in this investigation, there is probable cause to believe that the
items to be seized as described in Attachment B, which is attached hereto and fully incorporated herein, will be
located at the premises described in Attachment A, and are evidence, fruits, and instrumentalities of violations
of 18 U.S.C. § 542 (importation by false or fraudulent practice), 19 U.S.C. § 1304 (failure to mark goods with
country of origin), 18 U.S.C. § 1159 (violation of the Indian Arts and Crafts Act), and 18 U.S.C. § 371
(conspiracy).

**9. Business Name:**          Kuchi Gallery, Inc., d.b.a., Momeni's Gallery

   **Owner Name:**          Ismail Momeni

   **Search Location:**          222 Old Santa Fe Trail, Santa Fe, NM 87501

   **Organizational Role:**          Retail

Kuchi Gallery, Inc., d.b.a., Momeni's Gallery ("Momeni's") is a retail store located at 222 Old Santa Fe Trail in Santa Fe, NM. Ismail Momeni is listed as the President of Kuchi Gallery, Inc. according to the New Mexico Secretary of State database.

***Financial Links to Sterling***

An examination of Sterling financial records revealed four payments made from Kuchi Gallery, Inc. to Sterling Islands between 5/23/2013 and 6/10/2014.

| Date | Payer / Memo | Amount | Payee |
|------|--------------|--------|-------|
| 5/23/2013 | Kuchi Gallery | $3,122 | Sterling |
| 6/24/2013 | Kuchi Gallery | $7,500 | Sterling |
| 7/24/2013 | Kuchi Gallery | $7,500 | Sterling |
| 6/10/2014 | Kuchi Gallery | $7,985 | Sterling |

***Recent Covert Purchase***

On October 20, 2015, I visited Momeni's in a covert manner and observed jewelry, rugs, pottery and other items for sale. The jewelry offered for sale was displayed in several cases in one section of the business. I observed several items for sale which were consistent with both Sterling imports and IJW imports. Specifically, I observed pendants, rings, and necklaces which appeared to be consistent with Sterling imports and several rings, bear pendants, and bracelets which appeared to be consistent with IJW imports.

Two male subjects were present at the business while I was there. The older subject, who identified himself as Noor LNU, helped me throughout the contact. The other subject identified himself as Hamed LNU and assisted me at the end of the contact. I asked to look at several of the items which I knew to be consistent with the imported items. Among these items were:

- A bear pendant which was consistent with the IJW imports in its shape and design. The bear pendant was two-sided and the design stamped into the metal on the back side of the bear was consistent with other IJW imports that I have seen from previously documented inspections of IJW imported jewelry. The bear pendant did not have the "IJ" initials seen in the IJW imports, however. Noor LNU told me the bear pendant was Zuni-made and, "one, only," which I understood to mean one-of-a-kind. After covert contact, I compared the bear pendant with

47

another bear pendant which I documented during the IJW inspection I conducted on February 20, 2105.  The two items appear to have an identical inlaid design.



- A butterfly necklace which I knew to be consistent with Sterling imported jewelry.



Sterling Importation Photograph



Momeni's Gallery

- An inlaid silver cuff bracelet, marked for $1700, with "IJ" initials stamped in it. The bracelet was consistent with those imported by IJW, previously.





- An inlaid ring which I knew to be consistent with those imported by IJW. The ring was offered for sale for $1300 and had "IJ" initials stamped in it. I asked Noor LNU if the items were also Zuni, in reference to the bear pendant which Noor LNU told me was Zuni-made. Noor LNU responded, "it's the same." I asked about the "IJ" initials and if Noor LNU knew the artist. Noor LNU told me that he did know him and that he's, "the guy in Albuquerque."

 

- A "double bracelet" which I knew to be consistent with IJW imports. I have seen items consistent with this bracelet in both the IJW inspection that I conducted on February 20, 2015, and in photographs taken during the IJW inspection conducted in Louisville, KY by USFWS Wildlife Inspectors on February 10, 2015. The bracelet had the initials "IJ" stamped in it. I remarked that it was probably made by the same guy, referencing the bracelet and ring, above. Noor LNU agreed by saying, "yeah."

- I walked into another section of the store and asked, "is this Native American stuff too?" Noor LNU replied, "oh yeah."

- A pendant which I knew to be consistent with those imported by Sterling. Specifically, the pendant was consistent with items documented during prior Sterling import inspection. Referring to the pendant, I stated that I wanted to make sure I got something Native American and Noor LNU replied, "That's what it is…"




Momeni's Gallery




Sterling Import Photographs

I repeatedly mentioned the jewelry and that I was surprised in the variation of the designs within the same tribal affiliation. At no time did Noor LNU correct me and tell me the items were imported. In addition, nothing in the store advised a potential customer that the items were imported and not Native American-made as claimed by Noor LNU. I asked Noor LNU how long he had been selling Indian jewelry and Noor LNU told me that he had been selling for sixteen years.

The ring, bracelet and pendant were all sold to me for $1559.80, in violation of the 18 USC 1159. I asked Noor LNU one more time if he knew the identity of the artists who made the items. Noor LNU replied that he did not. I told him it didn't matter as long as my father knew the item was Zuni-made. Noor LNU replied, "Yeah, he will know."

**Conclusion**

Based on the facts related within this affidavit, my training and experience, and the training and experience of agents and investigators involved in this investigation, there is probable cause to believe that the items to be seized as described in Attachment B, which is attached hereto and fully incorporated herein, will be located at the premises described in Attachment A, and are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 542 (importation by false or fraudulent practice), 19 U.S.C. § 1304 (failure to mark goods with country of origin), 18 U.S.C. § 1159 (violation of the Indian Arts and Crafts Act), and 18 U.S.C. § 371 (conspiracy).

**10. Business Name:**          Gold House LLC.

    **Owner Name(s):**          Mark Shaw / Ala Shawabkeh

    **Target Location:**          218 Old Santa Fe Trail, Santa Fe, NM 87501

    **Organizational Role:**          Retail

Gold House is a retail jewelry store located at 218 Old Santa Fe Trail in Santa Fe, NM. Ala Shawabkeh is listed as the officer for Gold House LLC., according to the New Mexico Secretary of State database. However, Mark Shaw is listed as the owner of Gold House according to their website, www.santafegoldhouse.com, and a law enforcement database.

### Recent Covert Purchase

On October 20, 2015, I visited Gold House in a covert manner and observed jewelry and other crafts for sale. Specifically, I observed several pendants, rings, and necklaces, offered for sale, which were consistent with both Sterling imports and IJW imports. I observed two male subjects and one female subject working at the store. During the contact, the female subject who introduced herself as Christina LNU, and one of the male employees, Simon LNU showed me the jewelry and sold me two items.

Throughout the contact, I asked to look at items which I knew to be consistent with both IJW imports and Sterling imports. Specifically, I looked at or was shown:

- A "cornrow" silver ring with a feather symbol stamped on the inside, marked with the price of $300. I recognized the design and the symbol as being consistent with Sterling imported jewelry documented previously in the investigation. When I asked

Gold House Purchase



  Christina LNU who made the ring, she referred the question to Simon LNU. Simon LNU explained that the silversmith, "signed with feather but I cannot tell. Some of them they use initials…"

- A "spinner" necklace and earrings set which I recognized as consistent with items I had seen during my inspection of an IJW importation of jewelry on February 20, 2015. I also noted that the earrings appeared to be mounted on the same kind of card, which reads, "Sterling Silver," as the IJW importations.





- A silver, inlaid bear pendant, marked with a price of $1500, which I recognized as being consistent with IJW imported jewelry. Specifically, I recognized the overall inlaid design on the front of the pendant, the stamped design on the back of the pendant, and the "IJ" initials stamped in the leg of the bear. Upon closer examination of the bear pendant subsequent to the purchase, I found that the stamped metal design was identical to a pendant documented during my covert inspecction of an IJW importation on February 20, 2015.

Gold House Purchase

Importation Photograph



I agreed to purchase the ring and the bear pendant. Christina LNU, speaking about the good prices they have in the store, said, "we're able to give you really good prices because we work directly with the artists and we buy a big amount of whatever they have."

I then asked Simon LNU who the silversmith was that made the bear pendant as I referenced the "IJ" initials marked in it. Simon LNU told me that Ervin Tsosie made the item. (It should be noted that this name was not written anywhere in the store. As such, the spelling may not be correct.) I asked if he was Navajo, to which Simon LNU replied, "uh yeah." An open source search of the name, Ervin Tsosie, revealed that Ervin Tsosie is a Navajo silversmith renowned for his extremely intricate inlay work. Some of this work includes inlaid bear pendants.

Simon LNU determined the final price of the items to be $1040 (before tax).  After I purchased the items I, once again, asked the name of the artist who made the bear pendant so I could write it down.  Christina LNU asked Simon LNU who said, "Ervin Tsosie."  I asked how the name was spelled and Simon LNU said, "s-u-s-i."  Simon LNU then looked for and found another pendant which he said was made by Ervin Tsosie and explained that it had the intials, "ET," in the item.  I asked Simon LNU about the "IJ" initials found in the bear pendant that I had purchased.  Simon LNU agreed that the "I" in "IJ" might stand for Irvin.  Simon LNU then showed me what appeared to be a genuine Ervin Tsosie pendant and said, "he did this one too."

I then asked Simon LNU if he knew who made the ring by referring to the feather symbol.  Simon LNU responded that he did not know and did not have the book to determine the artist.  Simon LNU went on to say that at the end of the book the symbols corresponding to the silversmiths are listed.  In my experience I have seen these books of Native American Artists referenced in other Native American jewelry stores.  I said, "Navajo is good enough," to which Simon LNU replied, "yeah."  Simon LNU sold me two items in violation of 18 USC 1159.  Additionally, within Gold House, there were many more items offered for sale and displayed in violation of 18 U.S.C. § 1159.

*Conclusion*

Based on the facts related within this affidavit, my training and experience, and the training and experience of agents and investigators involved in this investigation, there is probable cause to believe that the items to be seized as described in Attachment B, which is attached hereto and fully incorporated herein, will be located at the premises described in Attachment A, and are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 542 (importation by false or fraudulent practice), 19 U.S.C. § 1304 (failure to mark goods with country of origin), 18 U.S.C. § 1159 (violation of the Indian Arts and Crafts Act), and 18 U.S.C. § 371 (conspiracy).

## VI.    ADDITIONAL TRAINING AND EXPERIENCE

Based on my training and experience, involving the import and trafficking of counterfeit and contraband goods, and related financial crimes, including, my involvement in numerous investigations, searches and arrests during my career as a law enforcement officer, as previously described in the background section of this affidavit; my involvement on a number of occasions in interviewing subject-matter experts, persons closely associated with the counterfeit and contraband industry, witnesses, confidential informants, and cooperating individuals in prior trafficking investigations, as well as what other agents and police officers have advised me when relating the substance of their similar interviews and the results of their own trafficking investigations; and other intelligence information provided through law enforcement channels, I know the following:

a.    During the course of commercial, residential and vehicular searches, it is common to find items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

b.    It is generally a common practice for traffickers of prohibited goods to store their inventory and related materials (as described above) in their residences and businesses;

c.    It is generally a common practice for traffickers of prohibited goods to maintain in their commercial locations and residences records relating to their trafficking activities.  Because prohibited goods derive value from purported authenticity, in many instances traffickers will maintain records of authenticity. It is common practice for traffickers to keep transactional records to show sale and transfer of goods.  Additionally, traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their business;

d.    It is also a generally common practice for traffickers to maintain records of wire transfers, cashier's checks, and money orders related to the sale and transfer of prohibited goods. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with trafficking of prohibited goods would also typically be maintained in residences and businesses; and

e.    Evidence relevant to the trafficking and importation of counterfeit and contraband goods is typically recovered from the main physical location of distribution and sale, and in addition, from vehicles used to transport the prohibited goods, and from other structures on the property being searched, as for example, other storage lockers/areas, detached closets, containers, and

55

yard areas associated with the main residence and used in connection with or within the curtilage of said residence.

Based on the foregoing facts, my experience and training, and the experience and training of other experienced agents with whom I have consulted, there is probable cause to believe that the following evidence, as described in Attachment B, for the period 2010 to present will be found at the search locations, as described in Attachment A.

A.   *RECORDS AND TANGIBLE ITEMS*

1.   The prohibited goods themselves;

2.   goods related to the packaging, processing, storage, shipping and transportation of those prohibited goods;

3.   books, records, receipts, notes, ledgers, correspondence and other records relating to the distribution of the prohibited goods;

4.   personal books and records reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of the prohibited goods;

5.   records relating to income and expenditures of money related to the sale and transfer of prohibited goods, for example, money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers; and

6.   documents indicating travel in interstate and foreign commerce such as travel itineraries, motel and hotel receipts, credit card receipts, and telephone bills.

B.  *COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS*

As described above and in Attachment B, this application seeks permission to search for records that might be found on the premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

*Probable cause*

I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

56

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space— that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, spreadsheets, financial records, invoices, I am aware that computer equipment was used to generate, store, and print documents used in the scheme to violate the Indian Arts and Crafts Act. There is reason to believe that there is a computer system currently located on the premises.

57

*Forensic evidence.*

As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant

58

at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know that when an individual uses a computer to transmit electronic messages to place orders intending to violate the Indian Arts and Crafts Act, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

60

*Necessity of seizing or copying entire computers or storage media.*

In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

*Nature of examination.*

Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

The seizure of a company's computers may limit the company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## VI.    CONCLUSION

Based on the foregoing facts, my training and experience, and consultation with other experienced agents in investigations involving the trafficking and importation of counterfeit and contraband goods, and related financial crimes, there is probable cause to believe that the items to be seized as described in Attachment B, which is attached hereto and fully incorporated herein, will be located at the premises described in Attachment A, and are evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 542 (importation by false or fraudulent practice), 19 U.S.C. § 1304 (failure to mark goods with country of origin), 18 U.S.C. § 1159 (violation of the Indian Arts and Crafts Act), and 18 U.S.C. § 371 (conspiracy).

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

I declare under penalty of perjury that the above statements are true and accurate to the best of my knowledge and belief.


RUSSELL STANFORD
Special Agent
US Fish & Wildlife Service,
Office of Law Enforcement


Subscribed and sworn to before me on this 26th day of October 2015 at Albuquerque, NM. *at 1:38 pm.*


UNITED STATES MAGISTRATE JUDGE

63